Thank you, Your Honor. May it please the Court, my name is Jacob Hubert and I represent Appellants Dr. Mark McDonald and Dr. Jeff Barkey. The District Court erred when it denied my clients a preliminary injunction to prevent the defendants from enforcing AB 2098, a law that threatens doctors with professional discipline, including the loss of their licenses to practice medicine, for saying things to their patients about COVID-19 that the state disapproves of. The law restricts speech based on its content and its viewpoint, and for that reason violates the First Amendment. And this should be an easy case, because it's directly controlled by this Court's decision in Conant v. Walters. In Conant, the federal government had announced a policy that it would take away doctors' ability to prescribe medical marijuana to their patients. And this Court readily recognized that that infringed on doctors' free speech rights. The Court said the policy struck at the core First Amendment interests of doctors and patients. The Court said physicians must be able to speak frankly and openly to their patients. And the Court said physician speech is entitled to First Amendment protection because of the significance of the doctor-patient relationship. And the Court concluded that because this was a content and viewpoint-based restriction on doctors' speech, it was a blatant violation of their First Amendment rights. And this case is exactly the same. In this case as well, the state has specifically threatened to punish doctors for their advice, their recommendations, to patients in itself. And for that reason alone, the plaintiff should prevail here. Also, since this Court decided Conant, the Supreme Court decided the NIFLA case, which further bolsters the plaintiff's position. In NIFLA, the Court made clear that professionals doing their jobs had the same free speech rights as everybody else. And the Court specifically emphasized the importance of free speech for medical professionals. The Court recognized that medical professionals could speak to each other about appropriate treatments, and a medical professional could have a good-faith disagreement with the government about appropriate medical treatments. And the Court said it's important to protect the rights of medical providers to speak their views to patients because ideas about appropriate medical treatments can be tested in the marketplace of ideas, just like any other kind. And it's very dangerous for the government to prescribe only one appropriate view, and particularly for the government to do so in the name of regulating conduct. Nonetheless, the defendants argue that they should prevail based on this Court's recent decision in the Tingley case. But Tingley didn't overrule Conant, and it doesn't control here. In Tingley, this Court upheld a principle of conversion therapy, that is, therapy to change somebody's sexual orientation or gender identity. And the Court said that the First Amendment didn't apply at all there, under the exception that NIFLA recognized for regulations of professional conduct that incidentally involve speech. The Court said that preventing conversion therapy was just a ban on a particular treatment, and the government can ban particular treatments. It just happened that that treatment inherently involves speech and carrying it out. Well, this case is nothing like the Tingley case. Here, the government has specifically prohibited physicians from giving particular advice, even separate from treatment. And the government, and nobody would argue that advice about COVID-19 is truly treatment for COVID-19. They're clearly different things here. Nonetheless, the government argues here that when AB 2098 talks about advice, it's really talking about advice bound up with treatment as a single thing that would be called medical care, and you really can't separate one for the other. And so it's all conduct, and under Tingley, you can regulate it all as conduct. But that can't be right, because that's the opposite of what the Court said in Conant. In Conant, the Court recognized that yes, the government could ban giving medical marijuana as a treatment, as the federal government had, but nonetheless, the government could not stop doctors from recommending medical marijuana as a treatment, because that would infringe on their free speech rights. The government also said in AB 2098, because after all, doctors can already be held liable for what they do or don't say to their patients under the law of medical malpractice. But medical malpractice is a completely different sort of context, because with medical malpractice, the doctor can only be held liable if a patient is actually harmed, and that's proved at a trial. And a doctor can give advice that's contrary to the government's view, that's contrary to the supposed scientific consensus on an issue, freely, without incurring any liability just for doing that, if the doctor thinks that's what's best for the patient, if the doctor thinks that's what's going to get the best result. And of course, the prospect of liability for malpractice is going to make doctors careful about what they say. It's going to give them an incentive to only give advice that will lead to good results, but nonetheless, they can give their honest, best advice. But that's not how AB 2098 works. AB 2098 imposes strict liability for speech. It punishes advice even if the patient doesn't follow the advice. It punishes advice even if the patient follows the advice and then has a good result. And that actually could happen. You could have a patient who receives advice that violates AB 2098, and the patient gets a good result, and the patient goes and tells a co-worker, my doctor advised me to do this, and my COVID cured up right away, and I'm happy with it. And if the co-worker disapproves of the advice, the co-worker could complain to the medical board, and the doctor could be punished for speech that apparently actually led to a good result. And so, of course, that possibility is going to exist. It will stop them from giving their best, honest advice just because the government might disapprove of it and might punish them for it. Another problem with this law is that, under both the First Amendment and the Due Process Clause, is that doctors can't even know how to comply with it. The statute prohibits doctors from disseminating misinformation that's contradicted by contemporary scientific consensus contrary to the standard of care. That definition, just on its face, is kind of a jumble of words that doesn't make grammatical sense. But even putting that aside, there's the question of how is a doctor supposed to know what the contemporary scientific consensus is, particularly for something like COVID-19, where, from the very beginning, people's ideas about how to treat it and how to prevent it were constantly evolving, and something that was considered appropriate one day might not be considered appropriate the next. And so doctors faced with this situation just have to read the literature that's available, look at the evidence that's available to them, speak with their colleagues, and then just use their professional judgment to decide what's going to be best for their patients. There's no contemporary scientific consensus that they could even look up. I mean, they could look to the latest pronouncements of government officials or government-approved officials, but that's changing all the time. And that gets back to the core First Amendment problem, that even if you have that, I mean, the government isn't supposed to be setting official true and false conclusions about disputed issues. Again, NIFLA recognized that medical professionals can disagree with each other. They disagree with the government, and views evolve, and they evolve based on the exchange of ideas. Patients are entitled to hear different ideas from different doctors and decide what they think is best for themselves. And so, and that's why this fundamentally violates the First Amendment in any event. And, you know, in the Conant case, the federal government said there's no legitimate medical use for marijuana. It's all harmful. And it said, well, there we need to restrict speech so people don't make bad decisions. But that didn't matter because the ban on recommendations was a content-based and viewpoint-based restriction on speech, which the First Amendment simply doesn't allow. And so for these reasons, and the reasons in our brief, we would respectfully ask that this court protect doctors' right to free speech, protect patients' right to get their doctors' best honest advice, and reverse the district court. Good morning, Your Honors, and may it please the Court. Adam Shulman for Appellants Corris and Fitzgibbons. And I know today is COVID theme day or a mini-COVID theme day here, but if I could, I'd like to take a step back and start with the general idea of misinformation and what the state of California can do about misinformation. Because I think the Supreme Court has given good guidance to this decision. In that decision, every single opinion, not only for justice plurality, but the concurring opinion from Justice Breyer and the dissenting opinion from Justice Alito, shows California has taken the wrong approach in this case. Justice Alito and Justice Breyer both stated that there's a grave and unacceptable danger of suppressing true speech by penalizing purportedly false speech in areas of broad public concern. And the for justice plurality opinion was obviously even more adamant that that's the wrong approach. The for justice plurality said, our constitutional tradition stands against the idea that we need Oceania's ministry of truth. Only a weak society needs government protection or intervention before its resolve to preserve the truth. Truth needs neither handcuffs nor a badge for its vindication. And a major reason that laws like AB 2098 present a grave and unacceptable danger is that the pall that they cast over the doctor-patient relationship not only risks destroying the relationship, the independent advice, the honesty, and the candor that's crucial per conant, per nifla to that relationship, but it also risks ossifying the practice of truth. And one of the great examples of this in the brief, one that hit close to home for Dr. Kouros, is the example of Harold Ridley, the British ophthalmologist who found during World War II that pilots were returning home with the surgery, that windshields that were glass were different than plastic windshields. It was so his course that deviated from the scientific consensus, the medical consensus, the consensus would have never changed in the future. And of course there's even more, you know, potentially egregious examples. Would we still have lobotomization today? Would we still have phrenology? Yesterday's accepted wisdom is today's quackery and vice versa. The lesson of Alvarez is that misinformation, indeed in Alvarez, even deliberate disinformation, is protected unless it results in harm to a tangible, protectable interest like common law fraud, defamation, perjury. The legislature record here paints a very clear picture that California just wants to combat the misinformation that will cause people to make what the state views as bad decisions. But again, Alvarez lays out the available remedy for combating that misinformation. The remedy for speech that is false is speech that is true. That's the ordinary course in a free society. Absolutely. Well, if you decide McDonald, you would presumably order the court to grant their injunction. The preliminary injunction obviously wouldn't grant, wouldn't moot our full case, which seeks a permanent injunction. Sure, but this appeal, because your appeal is just challenging the stay decision, right? It is, but it's also challenging the stay decision and the refusal to grant our injunction as well, which equates to a practical refusal to grant our injunction under 1292 under the Carson line of cases. Then your argument is no, your appeal ultimately isn't moot and we need to decide the other case. If we decide the other case, that would automatically moot your appeal, wouldn't it? Well, part of our appeal is the refusal. Because the stay would expire. What? You should prefer to ... That would be a future event mooting the case now, but the case isn't moot now. We could just be decided together with the appellants on the merits of our claim for an injunction. The difference is, again, this is on the assumption that the McDonald case, the McDonald appellant, is going to go to your case, and the difference is do we direct the district court in your case to enter an injunction, or do we direct the district court to decide your motion for an injunction? Your decision on the merits in McDonald would dictate ... We brought the same vagueness claim and the same First Amendment claims that the McDonald case would dictate a different opinion. If the remedy is to vacate the stay, then pursuant to the ... I'm not sure that there's a practical effect, but I don't see the ... Presumably, if you're right that a decision in McDonald necessarily dictates your case, then the district court could see that. Correct, though that would potentially result in further briefing and potentially delay in him entering the injunction in our case, which, of course, every passing day where you're chilled as a First Amendment harm under the Supreme Court and this court's decision. Your appeal raises a different issue than the other appeal. In other words, your appeal is just from the state, right? It's also from the refusal to grant the injunction under 1292. It's an interlocutory appeal on that as well. The state has the practical effect of refusing the injunction. Well, did you appeal that order? Yes, under 1292, yes. Does that appeal and your appeal from the state are one and the same appeal? Is that right? They are from the same appeal, yes. If I may, I reserve the rest for rebuttal. All right, Ms. Zuliska. Good morning, Your Honors. May it please the Court. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. But California has already had a scheme in place to address when doctors are being fraudulent with their patients. I'm trying to look at the obviously negligence and med mal context. So there are other mechanisms to get at misconduct by doctors. It seems like the unique thing about the statute that we're talking about today is that it pinpoints on one particular issue, COVID, and what its proper treatments are and says that certain things are acceptable to say and certain things are not. So why getting that specific and honing in on just that particular thing and saying that we have to have a consensus about this precise treatment, why doesn't that take you out of the normal regulatory framework that we have typically had? Sure, Your Honor. And I think I have a couple sort of responses to that. The first is that, to be clear, the statute does not mandate that there has to be a consensus. There may well be situations where there is no scientific consensus or where multiple options fall within the standard of care. And in those situations, AB 2098 on its face is inapplicable. But speaking more generally to your question about sort of why are the other remedies that exist out there not adequate, AB 2098 does sort of address circumstances that are not picked up by other aspects of the regulatory framework. I think the section 2234 only reaches to repeated instances of negligence or to a single act of gross negligence or incompetence. So a single act of negligence would not fall within the scope of that statute. So there are situations of conduct that would be within the scope of AB 2098 that are not otherwise covered by other existing regulations on unprofessional conduct. And speaking to sort of the subject of AB 2098 generally, you know, when it comes to the regulation of medicine or just general First Amendment principles, constitutional principles, the state can choose to focus on one specific problem in front of it. And the legislature here recounted, and I think we've all seen news stories about how there are doctors saying things that are just egregious. You know, the vaccines contain microchips that will have aliens abduct you. The vaccines make you magnetic. They'll make you infertile. Things that are just not acceptable to give to a patient in the specific context AB 2098 covers, which is within the exam room, you know, while caring and treating for an individual patient. And so the legislature could have said, we're really concerned about this one kind of, you know, area of care for patients where we see things coming up that are concerning, potentially harmful, and we want to intervene to make sure that the patients are not being hurt, that doctors are treating patients in a way that is consistent with the medical community's understanding of what is the appropriate treatment, what is, you know, information that's accurate to give to a patient. I mean, you give some dramatic examples, and I understand why. But I mean, this is an interesting situation because particularly with COVID and what it is and how it's come about and the disagreement that has existed even amongst the medical community about what we do about it. To pass a statute that specifically addresses this topic and then to fold in there some sort of consensus requirement seems odd. Again, I think it is sort of a unique novel context in the COVID-19 sense, but this is consistent with the history of regulation insofar as it is pinged to the standard of care. It's pinged to, you know, the medical community's ideas of what is sort of off the table and what is on the table in terms of treating patients in ways that is appropriate for the individual instance that is in front of the doctor. What do you say to the point made by your friend across the aisle about, I mean, we need discussion because what we know today might be improved, might change, because we'll learn something different tomorrow?  I think the first is that AB 298 leaves a lot of room for a discussion to take place in ways that minimizes the potential harm for plaintiffs. A lot of speech is left untouched. Doctors can publish articles in scientific journals. They can go on talk shows. They can post on their blogs. You know, they can engage in research studies. There's a whole swath of ways in which the scientific community can engage in discussions, debates, and continue the evolution of scientific knowledge and the medical knowledge. This is focused in on a very specific context, which is when a doctor is treating one of their patients, and that is a unique context where there are concerns about the harms that that might pose to patients, such that, you know, we want to make sure that when doctors are trying out new theories, they're not out there using their own patients as subjects to experiment on in ways that might be harmful to them, that there are frameworks in place like institutional review boards, informed consent, studies that are, you know, peer-reviewed to make sure that this kind of discussion happens in a way that still preserves and protects the safety of individual patients. So would you think that, so I'm a patient, and I go in to my doctor, and I want to ask about vaccines because I'm, you know, there's all this argument out in the public square, and I don't know what the right answer is, and I ask my doctor, should I get my small kids a vaccine? And the doctor says, well, I mean, it's up to you, but I'll just tell you I didn't because I think that small children are less at risk. Is that doctor subject to liability under the statute? So if what they say is false, is contrary to the scientific consensus and outside the standard of care, they could be, yes. It's difficult, you know. But I'm asking you, like, apply this law to the scenario I just described. You said if, but, I mean, how are we going to know? The statute doesn't define what the consensus is, so how are we going to know? How is a doctor who's having that patient in their office going to know what he should or shouldn't say? Well, I think the first question the doctor can ask themselves is, is giving this advice to this patient consistent with the standard of care? And that is a question doctors have to ask themselves, have throughout time across the country, in all contexts, regardless of whether we're talking about COVID vaccines or broken legs or appendix removal surgeries. Doctors have to know, am I about to engage in conduct outside the standard of care? But isn't that exactly what they're worried about, is what is that standard of care, particularly when it pertained to COVID? I mean, I think that's what Judge Forrest is asking because, as you said, there were microchips involved and there were people that were saying children under this certain age shouldn't get them. So how does a doctor know where they're supposed to be? Isn't that exactly why they were afraid of this statute? But that's the problem, or that is the situation a doctor finds themselves in all the time. Whether we're talking about novel diseases or novel ways of treating diseases, it sort of, the way the medical system is regulated requires this standard of care. That's how it is regulated throughout the entire medical regulatory system, throughout the medical malpractice system towards, again, use the standard of care. And so maybe there are situations where it may be harder for a doctor to determine what the standard of care is. But at the end of the day, we rely on doctors to be able to make that determination. Well, that may be true because I think you're right. Standard of care is a term of art in this field, and doctors have an understanding of that. But this statute doesn't just refer to standard of care. It refers to the science consensus in the scientific community as though that's something different or in addition to the standard of care. And that's an issue. I think if you're speaking to the question of, is this sort of geared towards the question of vagueness or is this more about with respect to the First Amendment concerns? I think it relates to both. So, again, with respect to the First Amendment concerns, I think it is critical that what was going on in Conant was the state saying, you can never recommend this treatment ever, period, full stop. Regardless of whether or not the medical community might think that this is an appropriate way to handle the situation. And AB 2098 does not say that. It does not take any particular advice or treatments off the table categorically. It just says you need to act consistent with the standard of care of the scientific community. That scientific community part speaks more towards the information, is it false or is it true? And, again, there may be situations it's a little bit harder to determine, and if there's no consensus, the statute does not apply on its own terms. But there are also things where it's clear that there's a scientific consensus, that COVID-19 is caused by a virus, for instance, that the vaccines don't have microchips. And, you know, to the extent that there is concern that this part of the statute is too unclear, too ambiguous, you know, we have also argued that this court can sever it. That if that is the problem here, then we can sever that aspect of the statute. All the requirements for severability are met under California law and leave the remainder in place because it is sufficiently clear to say to a doctor, you cannot give your patients false information contrary to the standard of care. And that is consistent with how the medical field has long been regulated throughout history. I do kind of want to touch very briefly on this sort of idea that has come up a couple times about the necessity of harm, harm needing to be a prerequisite. I think it's important to, you know, point out that part of the purpose of the medical regulatory system is to prevent harm. That is reflected in the statutory law that says the primary purpose of the board is protection of the public. You know, and there may be many situations in which a doctor engages in potentially harmful behavior, say a surgeon who shows up drunk, that doesn't actually cause harm. For some reason, luck, intervention, he had a good day even if he was drunk. And the state regulatory system needs to be able to step in to remediate such professional conduct before it causes harm, and this is part of why things like the medical malpractice system are not going to replace, you know, the professional regulatory system. If the court has any further questions, I'm happy to entertain them. I guess I have one other question. If we disagree with you that the First Amendment doesn't apply, and we say that it does, and strict scrutiny has to be applied, do you think you can meet it? Yes, Your Honor, I think that we do. I think that the state serves compelling interests in protecting patients from receiving potentially harmful information or information that could result in negative results. I'm not sure that anybody would dispute that the state has an interest here. I think it would all be about narrowly tailoring. Yes, Your Honor, and I think that the tailoring requirement is met here. If you compare the sort of narrowness of the scope of what the statute reaches, in many ways it is just going to reach very egregious instances of behavior, since you've got all three distinct elements that whatever the care needs to involve information that's false, the second that it's contradicted by a scientific consensus, and the third that it's contrary to the standard of care. This is really gap-filling in a small gap, and so that speaks to the narrowness of the tailoring, particularly given that the state focuses in on solely what is happening with respect to caring for a specific patient rather than trying to reach out and get speech to the doctors that they're saying in public, that they're posting on their blogs, any of that. If there's no further questions, we'd ask that the Court affirm the decision below, and I'm happy to yield my time. Thank you. Hello again. One more point just on the procedural question that you asked before. There could be a second form of prejudice in addition to the fact that we would have to engage in briefing rather than get the injunction immediately, and that second form of prejudice would be that if the state would appeal from your Court's decision, we might not be a party to further proceedings and might not have the right to participate in those further proceedings. I do want to make four substantive points to what Ms. Liska said in her argument. The first was that she made the point that the legislature recounted several egregious examples, microchips, infertility, et cetera. Those were all social media examples. None of those examples were within the context of a patient-doctor relationship. In fact, in the legislative record, it noted that misinformation is an old problem, but there's something that's unprecedented, which was the fact that social media can disseminate that information to more people quicker than in the past. The statute doesn't address that at all, obviously, and we don't think the statute could constitutionally, but it shows the misfit between the legislative problem recognized and the solution adopted. Second point, Ms. Liska said that discussion can happen outside the confines of the relationship. Well, Conant says that it's First Amendment-protected inside the confines of the relationship. Conant talked about advice to a particular patient in their situation, not general advice, which this statute seems to cover beyond a particular patient's situation. For example, Dr. Coors is an ophthalmologist, but he gets questions about COVID, even though he's not treating the patient. The patient's family members might have questions, et cetera. Third point, Ms. Liska- I'm out of time, so sum it up. I'm sorry. I guess I'll just skip to the last point, which is that Ms. Liska made the point that the regulation can step in where there's a potential for harm. AB 2234 already does this, and it does it in a speech-neutral and generally applicable way. Thank you. Thank you, Counsel. I thank Counsel for your helpful arguments in this interesting case. The matter-and now I have to look at it-the matter of McDonald and Coors v. Lawson are submitted, and we are in recess for the rest of the day. All rise. This court for this session stands adjourned.
judges: TASHIMA, FORREST, Cardone